NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| D.C., a minor child, by his parents, S.C. and S.C., | x x x | Hon. Stanley R. Chesler, U.S.D.J. |
| Plaintiff, | x x | Civ. No. 04-2851 (SRC) |
| v. | x x | **OPINION** |
| MONTGOMERY TOWNSHIP BOARD OF EDUCATION, | x x x x | |
| Defendant. | x | |

### CHESLER, District Judge

**THIS MATTER** comes before the Court on cross-motions by Plaintiff and Defendant for Summary Judgment (docket items # 6 and 10). The Court having considered the papers submitted by the parties, and for good cause shown, grants Defendant's Motion and denies Plaintiff's Motion for the reasons set forth below.

### I. BACKGROUND

This Individuals with Disabilities Education Act ("IDEA") case concerns the school placement for Plaintiff D.C. ("D") during the 2003-2004 academic year. The case is brought on D's behalf by his parents, Mr. and Mrs. C. At issue is the Defendant Montgomery Township Board of Education's ("District") refusal to pay for the unilateral placement of D at the Bridge School, which was contrary to the IEP for the 2003-2004 school year. Defendant prevailed in the due process hearing before the Administrative Law Judge, wherein ALJ Hurd concluded that "the

IEP offered by the District for the 2003-04 school year provided and/or would have provided D.C. with an appropriate placement designed to meet his individual needs and confer meaningful benefit." As such, he denied reimbursement for the unilateral placement of D at the Bridge Academy. Subsequently, Plaintiff filed a Complaint in this Court on or about June 18, 2004, challenging the ALJ's findings and decision.

### A. Individuals With Disabilities Education Act, 20 U.S.C. 1400 et seq.

The Individuals with Disabilities Education Act ("IDEA") is the vehicle created by Congress to ensure states follow a mandate to provide a "free and appropriate education" to all disabled children. 20 U.S.C. §1412. "Educational instruction specially designed to meet the unique needs of the handicapped child," coupled with services "necessary to permit the child to 'benefit' from the instruction" constitute a "free and appropriate education." Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 756 (3d Cir. 1995).

For each child identified as eligible for special education, a written statement called an Individual Education Program ("IEP") is developed. The IEP, which addresses and includes several elements as provided under 20 U.S.C. §1414(d)(1)(A), is designed to ensure implementation of a free and appropriate education. S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 264 (3d Cir. 2003). In addition to defining the content required, IDEA provides that an IEP should be developed considering the strengths of the child, concerns of the parents, and recent evaluations of the child. Id. The IEP team consists of the child's parent(s), at least one of the child's special education teachers, a curriculum specialist, and if the parent or school board requests, a person with special knowledge or expertise related to the child's education. Id.; see also 20 U.S.C. §1414(d)(1)(B). IDEA mandates that the team review the IEP

annually "to determine whether the annual goals for the child are being achieved." 20 U.S.C. §1414(d)(4).

Under IDEA, as well as the New Jersey regulations adopted to implement IDEA, there exists a strong preference for mainstreaming, in other words, requiring education in the least restrictive environment. 20 U.S.C. § 1412(a)(5)(A). The Third Circuit has interpreted this requirement to mean "mandating education 'in the least restrictive environment that will provide [the student] with a meaningful educational benefit.'" S.H., 336 F.3d at 265 (quoting T.R. v. Kingwood Twp. Bd. Educ., 205 F.3d 572, 578 (3d Cir. 2000)). "The least restrictive environment is one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled." Carlisle Area Sch. v. Scott P., 62 F.3d 520, 535 (3d Cir. 1995).

IDEA does not require that a school district maximize a student's potential or provide the best possible education. Rather, the statutory obligation is satisfied "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." Bd. of Educ. v. Rowley, 458 U.S. 176, 203 (1982). The IEP must provide "meaningful" access to education, id. at 192, and confer "some educational benefit" upon the child. Id. at 200. Further, this educational benefit must be more than "trivial," in order to be appropriate. Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 247 (3d Cir. 1999). An appropriate IEP is "gauged in relation to the child's potential," id., and offers the potential for "significant learning" and "meaningful benefit." Id.

When a parent believes the district has not provided their child with a free and appropriate education as required under IDEA, he or she may object to the IEP and request a due

process hearing or a mediation conference. Lascari v. Bd. of Educ., 116 N.J. 30, 36 (1989) (citing applicable New Jersey state regulations). The parent(s) need only place the appropriateness of the IEP at issue, shifting the burden to the school district to prove that the IEP was indeed appropriate. However, the focus of this inquiry is on "the IEP actually offered and not one that the school board could have provided if it had been so inclined." Id. at 46.

In the situation where a child has been unilaterally placed by his parents in an educational setting contrary to the IEP, they may be entitled to reimbursement, but only if the school district "fails to meet its burden of establishing the appropriateness of its program and if the parents demonstrate they have acted in good faith." Id.; see also 20 U.S.C. § 1412(a)(10)(C)(ii). In essence, if the school district fails to show that it offered the student a free and appropriate education, the burden shifts back to the parents to establish they unilaterally placed their child in an appropriate program. Once an ALJ issues a final order following a due process hearing, the aggrieved party may appeal that decision to the federal district court.

### B. Prior Litigation

The parties to this case are not strangers to litigation. In a prior dispute between the parties, this Court affirmed an ALJ's decision regarding D's unilateral placement by his parents in the Newgrange School. The decision is on appeal to the Third Circuit, but is worth brief mention to understand the history of this case and the dispute between the parties.[1]

---

[1] Defendant's brief suggests that this Court would be second-guessing its own previous ruling in Montgomery Township Board of Education v. S.C., 02-cv-4916 (D.N.J. 2003), if the Court were to find Newgrange inappropriate in this case. In fact, both parties' arguments are replete with references to and reliance upon the previous litigation. Although the former dispute between these parties is useful to understand this case in context, it is not before the Court now. The instant case will be reviewed on its own merits and on the record currently before the Court.

D is a special education student who attended the Montgomery Township public school from first through third grade (school years 1996-97 through 1998-99).  In 1999, he was classified as eligible for special education and related services.  The following school year, his fourth grade year, an IEP called for D to be educated within the District's public schools.  Mr. and Mrs. C. rejected the IEP and determined a more appropriate placement was the Newgrange School.  They unilaterally enrolled him at Newgrange.  Mr. and Mrs. C. then sought tuition reimbursement from the District for this placement through a due process hearing.

Following hearings on the issue, an ALJ judge decided, and this Court affirmed, that the District had not offered a free and appropriate education to D and his parents' placement at Newgrange was appropriate.  As such, the District was ordered to reimburse the parents for the tuition and to create a formal IEP for D's continued placement at Newgrange.  D attended Newgrange School through the spring of 2003.

### C. Current Dispute

The instant dispute arises from D's school placement for the 2003-2004 school year.  At issue is D's unilateral placement at the Bridge School, which was inconsistent with the IEP designating Newgrange School.  Following are the relevant undisputed facts.

D attended Newgrange School from September 1999 through June 2003.  (Pa 468.) During his time there, Mr. and Mrs. C. were happy with the educational progress he made.  (Pa 468-69.)  On May 21, 2003, Mr. and Mrs. C. met with Joanne Tonkin, the Learning Disabilities Teacher Consultant assigned to D's case, to review the IEP for the next school year.  (Pa 259; Pa 470.)  Also at the meeting were Susan Jevins and Janet Friedman, special education teachers, and Bob Liebowitz, the Associate Director.  (Pa 472.)  A second meeting was held on June 4, 2003,

to review some corrections and adjustment requested by Mr. and Mrs. C. at the first meeting. (Id.) At that meeting, the parties agreed upon the IEP, including D's placement at Newgrange. (Pa 176-78; Pa 472-73.)  Mr. and Mrs. C. expressed no concerns about the Newgrange placement and made no indications of their desire to make a change in placement. (Pa 473.)  It appears from the record, however, that Mr. and Mrs. C. were unsettled about administrative changes at Newgrange as early as April 2003, and perhaps as early as March 2002. (Pa 473-78.) Mr. and Mrs. C. admit they were exploring alternatives to the school in the late Spring and Summer of 2003, (Pa 483-485), although they made no mention of this to the District at either the May 21 or June 4 meetings.

On June 20, 2003, approximately three weeks after signing the IEP, Mr. C. called Joanne Tonkin to express concerns about leadership changes at Newgrange, and to introduce the idea of a new school scheduled to open in the fall that could accommodate his son. (Pa 343-344.)  He followed up with a letter to Nancy Novack, Director of Pupil Services at the District, to request a meeting to "discuss the execution of D's 2003-2004 IEP." (Pa 205.)  He also advised Ms. Novack that he wanted the District to consider the Bridge Academy for his son's placement. (Pa 205.)  The District's attorney responded to the letter on July 3, 2003, with a letter informing Mr. and Mrs. C. that because Bridge Academy was not open, nor was it accredited, the District was not legally permitted to consider placement. (Pa 262.)  Ms. Novack confirmed this position in her July 14, 2003, letter, denying the meeting with Mr. and Mrs. C. and reiterating that unless Bridge Academy was accredited, it could not be considered. (Pa 206.)  Ms. Novack went on to write that the District was "open to meeting with [the parents] to consider D's return to [the] district or continuation of his placement at Newgrange." (Pa 206.)

On July 16, 2003, Mr. C. wrote Ms. Novack confirming a call between the parties on or about July 11, 2003. Again, he requested time to discuss D's placement at the Bridge School. (Pa 5.) On August 3, 2003, Mr. C. wrote another letter to Ms. Novack to "clarify several misstatements and false assumptions" made by the District's counsel in her July 3, 2003, letter. Specifically, he indicated that D had not been withdrawn from Newgrange and they had not sought application to the Bridge School. He further emphasized that the reason they wanted to meet with the District had only to do with placement of D, not his IEP, with which Mr. and Mrs. C. remained in full agreement. However, as requested in previous letters and phone calls, Mr. C. directed the District to refrain from signing a contract for D at Newgrange for the upcoming school year. (Pa 6.)

The primary concern by the C's regarding Newgrange for the 2003-2004 academic year was the departure of many staff members and teachers, including the school's principal. In early May 2003, Mrs. C and her PTO co-chair presented the Newgrange Board with the results of a survey conducted among Newgrange faculty regarding their intentions to leave the school at the end of the year. (Pa 476-77.) Shortly thereafter, the Newgrange Board terminated the principal, Ms. Morris, and the C's and other Newgrange parents began conversations to determine what could be done to "save Newgrange," and to explore alternatives. (Pa 484-85; Pa 591; Pa 594.)

One of the alternatives was establishing a new school. The Bridge School was incorporated on or about June 5, 2003. (Pa 596.) Mrs. C. chaired Bridge School's executive administrative committee and Mr. C. chaired the recruiting committee. (Pa 597.) Advertisements for the Bridge School appeared in the *Trenton Times* on June 20, 21, and 22, 2003. (Pa 599.) At some point in late summer 2003, several teachers and staff from Newgrange

7

assumed positions at the Bridge Academy. (Pa 57.)

Mr. and Mrs. C attended a Newgrange parent meeting on August 26, 2003, to discuss the upcoming school year with staff and teachers. (Pa 494.) However, this meeting did not diminish their concerns about Newgrange and when the school year started on September 3, 2003, Mr. and Mrs. C. did not send D to school at Newgrange. On September 4, 2003, Mr. and Mrs. C. wrote a lengthy letter to Ms. Tonkin regarding their concerns about D's placement at Newgrange. (Pa 207-209.) The letter included information they heard from parents who sent their children to the start of school that caused Mr. and Mrs. C. to be "extremely fearful that D's health, safety and welfare" would be in "immediate danger" if their son were to attend school at Newgrange. (Pa 208.) Mr. and Mrs. C. requested assistance from Ms. Tonkin in arranging D's start at Bridge Academy on September 15, 2003. (Pa 208.)

On September 10, 2003, Mr. and Mrs. C. wrote to Ms. Novack with further information regarding their reasons for wanting to enroll D at the Bridge Academy. (Pa 210-12.) In that letter, the C's directed the District to request the release of D's records from Newgrange and have them sent to Bridge Academy. At the time, Bridge Academy still lacked state certification, but the C's detailed the school's progress toward that goal and stated that "approval is imminent." (Id.) Ms. Novack's reply to the C's on or about September 17, 2003, reiterated the District's position that Bridge Academy could not be considered for D's placement because it lacked state approval. (Pa 225.)

On October 7, 2003, Mr. C. faxed Ms. Novack with confirmation of preliminary New Jersey Department of Education approval of the Bridge Academy. In that correspondence, he requested that Bridge Academy be substituted on D's IEP. He informed Ms. Novack that D's

program at Bridge constituted "many of the same teachers" that D had at Newgrange. (Pa 256.)

On October 10, 2003, Ms. Novack and Ms. Tonkin visited Bridge Academy (Pa 400.) They also visited Newgrange on October 28, 2003. (Pa 403.) During their visits, they concluded that the facilities and offerings at Newgrange were appropriate to execute D's IEP, and in fact were superior to that of Bridge Academy. The District subsequently denied the substitution of Bridge Academy to implement D's IEP and the C's sought a due process hearing for tuition reimbursement.

## II. STANDARD OF REVIEW

The motions before the Court are cross-motions for summary judgment, although they are essentially appeals of the ALJ's decision. In considering whether to affirm administrative findings, this Court must first determine the proper weight to accord the ALJ's decision. "[J]udicial review in IDEA cases differs substantively from judicial review in other agency actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review." Susan N., 70 F.3d at 757 (citation omitted). In Board of Education v. Rowley, the Supreme Court announced a distinctive standard of review which federal courts must apply when reviewing an ALJ's decisions under IDEA:

> [T]he provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notions of sounds educational policy for those school authorities which they review. The very importance with which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought. The fact that § 1415(e) requires that the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement that due weight shall be given to these proceedings.

458 U.S. at 206.  In short, the purpose of the "due weight" standard is to "prevent the court from imposing its own view of preferable educational methods on the states."  Id.

Nonetheless, the deference afforded an ALJ's decision is qualified.  The Third Circuit "has interpreted the Supreme Court's instruction in Rowley to require that a court consider – although not necessarily to accept – the administrative fact findings," D.R. v. East Brunswick Bd.of Educ., 109 F.3d 896, 898 (3d Cir. 1996), "[b]ut if the district court chooses to depart from the agency's ruling, it should provide some explanation for its departure." Carlisle Area Sch., 62 F.3d at 527.

Recently, the Third Circuit further defined the meaning of "due weight" and ruled that the proper standard of review of administrative decisions in IDEA cases is "modified *de novo.*" S.H., 336 F.3d at 270.  As such, "a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings.'  Id. (quoting Knable v. Bexley City Sch. Dist., 238 F.3d 755, 764 (6th Cir. 2001).

### III. DISCUSSION

Plaintiff seeks reimbursement for tuition and transportation costs associated with enrollment at the Bridge School.  Defendant Montgomery Township Board of Education maintains that D's placement at Newgrange was free and appropriate and consistent with the agreed upon IEP.  As such, Defendant asserts that Plaintiff's request for reimbursement for the Bridge School tuition must be denied.  Plaintiff further argues that procedural rights under IDEA

10

were violated when Defendant refused to convene an IEP meeting to discuss changing D's placement.  Finally, Plaintiff suggests that regardless of whether or not Newgrange is an appropriate placement, the closer proximity and reduced cost of Bridge Academy compel its selection for D's placement.

      The Court will consider each of Plaintiff's arguments in turn, but finds more than ample evidence in the record to support ALJ Hurd's conclusions and decision.  The Court, giving some deference to the ALJ's findings of fact, finds that a preponderance of the evidence of the record reveals that D's placement at Newgrange met the requirements under IDEA, that there were no procedural violations, and that equitable principals do not support judgment in favor of Plaintiff.  As such, this Court affirms the ALJ decision and grants summary judgment in favor of Defendant.

**A. Administrative Hearings and ALJ Decision**

      The ALJ heard testimony from Mrs. and Mrs. C., Ms. Novack, and Ms. Tonkin.  Further, Dr. Barbara Malmont, a neuro-psychologist, and Susan Morris, the Bridge School principal, testified on behalf of the Plaintiff.  Ms. Novack and Ms. Tonkin were qualified as experts and spoke to the appropriateness of the Newgrange program and the ability of Newgrange to implement D's IEP.  Dr. Malamut evaluated D in 1999 and then again in November 2003.  She testified as to the results of her report of that evaluation.  Dr. Malamut also visited Bridge Academy on March 3, 2004, to observe D.  Ms. Morris testified as to the programs and facility offerings at Bridge Academy.

The ALJ found Ms. Tonkin's and Ms. Novack's expert testimony regarding Newgrange "to be highly credible" and "persuasive." The ALJ remarked that Mr. and Mrs. C. were "credible" and commended their dedication and passion to their son's education, however, noted that their testimony regarding Newgrange was primarily based upon hearsay and was insufficient to negate the expert opinions concluding that Newgrange was an appropriate placement.

Following the four days of evidentiary hearings and consideration of post-hearing briefs, the ALJ rendered a decision in favor of the Defendant. The ALJ determined that the IEP offered by the District for the 2003-04 year, which included placement at Newgrange, did offer a free and public education. Newgrange, as described by the experts and other testimony, revealed "an appropriate placement designed to meet [D's] individual needs and confer meaningful educational benefit." Therefore, the ALJ concluded that Plaintiff failed to establish entitlement to reimbursement for the unilateral placement at the Bridge Academy, and the petition requesting that the District did not offer or provide a free and appropriate education and further requesting reimbursement was denied.

**B. Free and Appropriate Education**

Under IDEA, the District was not required to maximize D's potential, provide the best possible education, or place D at the school his parents liked best. Rather, the statutory obligation of IDEA requires "personalized instruction with sufficient support services to permit [D] to benefit educationally from that instruction." Rowley, 458 U.S. at 203. The developed IEP must have provided "meaningful" access to education, id. at 192, and conferred "some educational benefit" upon D. Id. at 200. In the present case, the parents are not contesting the IEP, but instead only the school placement chosen to execute the IEP.

Despite Plaintiff's invitation to compare the Bridge Academy to Newgrange, that issue is secondary to the appropriateness of the IEP placement offered by the District for the 2003-2004 school year. The issue of Plaintiff's eligibility for reimbursement of the unilateral placement at the Bridge Academy only arises if the District "fails to meet its burden of establishing the appropriateness of the program" it made available to D. Lascari, 116 N.J. at 36. In short, only if the District fails to show it offered a free and appropriate education when it placed D at Newgrange will the Court turn to the determination of whether the Bridge Academy was an appropriate placement warranting tuition reimbursement. In the instant case, this Court finds that the District has met its burden and has indeed shown that Newgrange was an appropriate placement. As such, the Court need not, and indeed cannot, turn to the testimony or analysis of the Bridge Academy's suitability.

The ALJ heard testimony from two qualified experts, Ms. Novack and Ms. Tonkin, regarding the Newgrange School and its appropriateness to carry out D's IEP. Ms. Tonkin is a learning disabilities teacher and consultant with over 20 years experience in special education, (Pa 58), and was a part of the team that developed D's IEP for the 2003-04 school year. Ms. Novack is a certified social worker with 20 years experience in special education as a child study team member and administrator. Both experts testified that based upon their visits, observations, and conversations with administrators, that Newgrange was an appropriate placement for D

Ms. Novack described the computer lab at Newgrange and its offerings to students, including the tailored programs and features specifically tailored to the special needs population. (Pa 806-10.) She also provided information regarding the facilities and what she had learned about the administrative changes at Newgrange. (Pa 407-12.) Ms. Novack's impression after

13

visiting the school on October 28, 2003, was positive and she commented on the high degree of professionalism at the school. (Pa 412-13.) Ms. Novack met with Principal Hedegus and Dee Rosenberg, head of the outreach center. Her conversations with these two individuals regarding the staff turnover and the changes in administration confirmed her opinion that Newgrange remained an appropriate placement for D and the implementation of his IEP. Ms. Tonkin testified that she, too, she found the program at Newgrange reasonably designed to enable D to obtain meaningful educational benefit. (Pa 353.)

Plaintiff argues that the high turnover in staff and faculty at Newgrange would have resulted in D having new teachers, but that the Bridge Academy was equivalent to "the Newgrange of old." Again, Plaintiff misses the point that the primary issue before this Court is the appropriateness of Newgrange and the offered IEP agreed upon for the 2003-2004 school year. Although the Court appreciates Plaintiff's preference for familiarity and particular teachers, the Court is simply unable to consider a comparison to the Bridge Academy as a basis for finding Newgrange inappropriate. The Court agrees with the ALJ's statement that "parents have no right to pick teachers," (Pa 861), and it further concurs with Ms. Novack's testimony that "turnover in staff happens." (Pa 829); see also Ga.L. v. Saddle River Bd. of Educ., 1999 N.J. Agen. LEXIS 427, at 42 (N.J. O.A.L) ("As long as the ... teacher is properly certified, there is no basis for the petitioner to name the teacher"). While the number of departures from Newgrange in August 2003 may be unusually high, this Court is convinced that the District adequately assessed Newgrange's suitability by focusing on the programming offered, relying upon the state certifications of the staff in place and the longstanding relationship with the school, and trusting the assurances of the school's principal. (Pa 827-30.)

Plaintiff argues that Principal Hedegus had only held his position for a month at the time of Ms. Tonkin and Ms. Novack's visit. However, aside from this assertion, Plaintiff provides no specific reason why Mr. Hedegus' representations about Newgrange should be discounted. Plaintiff does not suggest, and this Court has no reason to believe, that Mr. Hedegus lacked the educational credentials or experience to make assurances upon which Ms. Novack and Ms. Tonkin could reasonably rely. Plaintiff does not indicate any improper motivation or reason to question his truthfulness. Further, Plaintiff suggests that the District's decision not to produce anyone from Newgrange to testify necessarily proves that Newgrange was unable to provide information about how the school was capable of serving D's needs. The ALJ found sufficient support in the four days of testimony to determine that Newgrange was an appropriate placement. This Court gives deference to that decision, but on its own review also finds that the testimony by the two qualified experts provided more than adequate evidence to find the District's placement at Newgrange provided a free and appropriate education in the least restrictive environment for D.

Mr. and Mrs. C.'s testimony at the hearings expressed their concerns and views of the Newgrange School and D's placement. While the ALJ found the parents to be credible, and commended their commitment to D's education, this Court agrees that they nonetheless did not provide sufficient evidence to rebut the expert testimony of Ms. Tonkin and Ms. Novack. Much of their testimony regarding Newgrange was hearsay and lacked the first hand knowledge of might have given it greater weight. Further, the other witnesses produced by Plaintiff only to spoke to the Bridge School and its offerings. As stated earlier, whether or not Bridge Academy was an appropriate placement is not the initial question before this Court.

15

Having reviewed the record before the Court, giving some deference to the ALJ's findings of fact, this Court concludes that the District met its burden to show that Newgrange was an appropriate placement for D. By a preponderance of the evidence, the Court concludes that D's placement provided a free and appropriate education as required under the standards of IDEA. As such, the ALJ's decision is affirmed.

**C. Procedural Rights Under IDEA**

Plaintiff asserts that the District's denial to meet with D's parents regarding changing D's placement for the 2003-2004 academic year violated procedural rights under IDEA. Defendant contends that no such right exists under the New Jersey regulations, and that the District complied with N.J.A.C. § 6A:14-2.3 when it provided written responses to the parents' requests. Indeed, under the regulations, a meeting is not required when the District "declines to ... change the ... educational placement of the student." N.J.A.C. § 6A:14-2.3. In that case, written notice is sufficient. Id. The ALJ found that no procedural rights were violated, and this Court affirms that decision.

As required by IDEA and the New Jersey regulations, Mr. and Mrs. C. participated in meetings with the IEP team on two occasions in May and June of 2003 to discuss and finalize D's IEP for the upcoming school year. During those meetings, the parents expressed no hesitations as to D's placement at Newgrange and expressed satisfaction with the IEP. Their later request for a meeting involved only the request to change D's placement to the Bridge School. Indeed, in a letter to Ms. Novack on August 3, 2003, Mr. and Mrs. C. emphasized that the purpose of the meeting was not to develop a new IEP, as they were "pleased with the IEP." (Pa 6.) Instead, Mr. and Mrs. C. sought "to discuss the best out-of-district placement to execute

the current IEP." (Pa 6.) As such, the written response by the District was appropriate under the regulations and despite the request for a meeting, it was not required and as such cannot be a violation of procedural rights under IDEA.

This Court agrees with the ALJ's decision that "the District acted appropriately in advising the parents in writing that a meeting was unnecessary until the Bridge Academy was opened, approved and accredited." Without approval or accreditation, the District could not consider the Bridge School unless certain criteria were met. N.J.S.A. § 18A:46-14; N.J.A.C. § 6A:14-4.3. Considering that an appropriate placement at an accredited and approved school existed to implement D's IEP, it appears the District was without any reason under the regulations to consider the Bridge Academy for D's placement. As such, this Court finds that not only was the decision not to meet with D's parents appropriate, and not a violation of the procedural requirement under IDEA, but the course of action taken by the District was entirely reasonable.

**D. Equitable Grounds Argument**

As a last effort, Plaintiff attempts to argue that equitable principles support judgment in their favor. Specifically, Plaintiff puts forth the argument that a decision in favor of the District will provide unjust enrichment as the District did not pay tuition expenses on D's behalf for the 2003-2004 school year. Tuition reimbursement is the crux of this case and indeed had the District failed to meet its burden, the Plaintiff would be made whole.

Plaintiff suggests that "equitable considerations are relevant in fashioning relief," Burlington v. Dep't of Educ., 471 U.S. 359, 374 (1985). However, despite this Court's "broad discretion" over such relief, id. at 369, it is only where the Court has determined that relief is

appropriate that the consideration of those factors come into play.  20 U.S.C. §1415(i)(2)(C)(iii).  This Court has already determined that relief is not appropriate in this matter and nothing about the circumstances of this case compel the Court to warrant a deviation from the case law and regulations which exist to administrate this very situation.  Therefore, this Court is not inclined or interested to entertain arguments provided by both parties regarding the ill-will and improper conduct of their adversary.

**IV. CONCLUSION**

As required by the standard, this Court has reviewed the voluminous evidence in the record, as well as the ALJ's assessment of the arguments raised by the parties and his findings based on the testimony and written exhibits before him.  Having done so, this Court finds, based on a preponderance of the evidence in the record, that the Defendant District has met its burden of proof to establish that the IEP placement at Newgrange school was a free and appropriate education.  As such, the Court need not consider whether Plaintiff's parents should be reimbursed for the costs of D.C.'s unilateral placement at the Bridge School.  Defendant's motion is granted, and Plaintiff's motion is denied.  An appropriate form of order will be filed herewith.

Dated: May 23, 2005

_____/s/_____
Stanley R. Chesler, U.S.D.J.